Our next case for argument is Yuga Labs v. Ryder Ripps v. Jeremy Cahan. And let's see, Mr. Tompros. Yes, Your Honor. May it please the Court, Louis Tompros for the appellants. I'd like to reserve five minutes for rebuttal, if possible. This case raises several novel questions stemming from Yuga's abuse of trademark law to stifle freedom of expression. Nevertheless, this Court can resolve this appeal without breaking significant new ground by reversing an either nominative fair use or trademark ownership, which are the two dispositive areas which I propose to focus on primarily, though of course I'm happy to address anything else Your Honors would like. As to nominative fair use, the District Court's decision directly contradicts this Court's holdings in Carnes that fair use applies even if the alleged infringer's ultimate goal was to sell his own product, and Toyota, this Court's decision that the plaintiff has the burden to prove that nominative fair use does not apply. Let me ask you, how does this nominative fair use defense survive post-Jack Daniels? What's your view as to whether or not Jack Daniels applies? Jack Daniels is relevant to the First Amendment issue, but no court has ever held that the Jack Daniels First Amendment analysis is relevant to nominative fair use, and that's because what nominative fair use does is it replaces the likelihood of confusion test under sleek craft. So Jack Daniels doesn't change the nominative fair use calculus one way or the other, and there are no additional hurdles needed to jump over Jack Daniels to get to that. Jack Daniels also was applied to the dilution claim, correct? Correct, Your Honor. That's correct. And this is not a dilution claim at all? No. But it did kind of look to the purposes of the Lanham Act to ensure consumers can tell where goods come from with respect to dilution. It was concerned with respect to the ultimate question, whether the use of a mark is similarly source-identifying. Isn't that a relevant consideration here, whether or not the mark is similarly source-identifying? Well, respectfully, Your Honor, I think that there is nothing in Jack Daniels that changes the existing nominative fair use requirement, which is that under nominative fair use, it is true that there is a burden on the plaintiffs to prove initially that they used the mark to refer to the trademarked good. That is, it's only nominative fair use if it names. So to that extent, I think that there is some potential relationship in that sense. Jack Daniels didn't purport to change that at all. And, indeed, in this case, there is no question that the appellants used the marks, B-A-Y-C, Board Ape Yacht Club, the images, to refer to the Board Ape Yacht Club of Yuga. In fact, that was an undisputed fact at summary judgment. Yuga Labs proposed, and it's in the record at AER 1430, paragraph 70, Yuga proposed the undisputed fact. Defendants have stated that B-A-Y-C represents the abbreviated title of Yuga's NFT collection. We didn't dispute that. There was no dispute that Mr. Ripps and Mr. Cahan were using these marks to name Yuga as part of their criticism of Yuga. And that's why nominative fair use applies. Now, the error that the district... The problem with that for me is you're also using... Your client is also using B-A-Y-C and the Board Ape Yacht Club to refer to its own product that it's selling, its own NFT. I mean, it's embedded right in the name of the... or the description of the NFT and also the contract name. So it's both, right? Your Honor, it is... They are definitely using the name as part of the title of their own product. But that is allowed under nominative fair use. That's exactly what nominative fair use permits. It permits, for example, in the applied underwriters case, a company to call its program a program about applied underwriters. It permits, in the Toyota case, a repair shop to talk about the Lexus. Lexus, is that where they repair? And it permits, most tellingly, in the... But in those cases, the factual context demonstrated that you wouldn't have confusion about origin. Agreed, Your Honor. And how is that the case here when the factual context is that your clients are offering on the market something that looks exactly the same as Yuga's product? And so you don't have a context that demonstrates, that shows distinction. So I think that, respectfully, Your Honor, we disagree. It was certainly a disputed issue of fact as to whether there was such a distinction. There were. If you look at the actual NFT that Mr. Ripps and Mr. Cain were selling, the text is different. It shows the creator name, Ryder Ripps. It shows a different origin, a different creation date, different metadata. The database entry, which is all an NFT is, right? It's like the certificate in the name of star analogy that we used in our brief. That certificate was completely different. It looks nothing like the Yuga NFT. How do you explain away the contract name, which is BoardApe Yacht Club, exactly the same? It is, but it was always shown along with Ryder Ripps. That is, when the project was referred to, it was referred to as the Ryder Ripps BoardApe Yacht Club. And even in the EtherScan token, it had the project name, it had the title, BoardApe Yacht Club. Immediately under that, or in some cases above, was Ryder Ripps, the creator name. So it was described to be, it is used in the title for sure, but in the context, there is at minimum a disputed issue of fact as to whether the creation of that would suggest sponsorship and endorsement. And it is also clear that nobody actually ever bought a RRBAYC thinking that they were buying a Yuga NFT. The district court, when going through SleekCraft's setting, said that it did not find that there was any evidence of actual confusion. So the addition of the name – I don't know if it said that it didn't find any evidence of confusion versus that there was some offered, but the court didn't need to – Fair enough, Your Honor. You're exactly right, Your Honor. The district court did not make a determination that there was actual confusion. But the error that the district court made happens before we even get into this question that Judge Forrest was asking about suggesting sponsorship or endorsement. The error that the district court made was by finding that nominative fair use was categorically inapplicable, and that is incorrect as a matter of law under this court's decision in Cairns. Cairns says that it is okay to use the name of someone else's product to market your own product if you are using it to talk about theirs. And that is exactly what Mr. Rips was doing. That's why this is just like Toyota. It is just like Cairns, which is – And again, given that Cairns is a 2002 case and it predates Jack Daniels by 21 years, the ultimate question that we have is regarding Jack Daniels and whether or not it applies and given the analysis and the concerns of the Lanham Act and whether or not those same concerns are present here. I mean, I would say this about Jack Daniels in that context, Your Honor. This court has decided post-Jack Daniels, this court very squarely decided in Punchbowl, that all of the prior First Amendment law applies other than the very limited issue in Jack Daniels as to whether the mark was being used as a mark. So this court, I think, has already left in place all of the rest of the doctrine, which is another reason why I don't – I understand, Your Honor, that the cases – these cases are not post-Jack Daniels, but Jack Daniels was focused specifically on the First Amendment context of – and the Rogers test and not on nominative fair use. And this court in Punchbowl did say essentially everything else is left alone. I'm not sure they said that. It was a First Amendment case, correct? It was, Your Honor. It wasn't a fair use case. It was a First Amendment case, not a fair use case. And so I think the question is still open. Fair enough, Your Honor. And it may be that it is worth revisiting, in bank or otherwise, the test for nominative fair use in this circuit. But as the test currently stands, the district court unquestionably misapplied it. And it misapplied it by saying that it's categorically unavailable, simply because they were using the name of Board A Piat Club to market their own goods. The district court – Looking at the elements of the nominative fair use defense under Toyota and New Kids on the Block, one of them is you use the mark only as reasonably necessary to identify the product. That's correct. And no further, basically. And here, where the mark is embedded in the name of your client's product, how can you meet that requirement? Because that is true of almost every nominative fair use case. It is true of Lexus. The name was embedded. The Lexus mark was embedded in the name. It is true of Applied Underwriters. It is true of Food Chain Barbie, the Mattel case, which was another case. I guess I'm coming back to the same question I had. In all those cases, you had a factual context that showed that the person who was referencing the prior, the Barbie or the Lexus or whatever, was not making Barbies and was not making Lexuses, was doing something else, was providing a service, was doing a totally different creative endeavor. And that is not the case here. Respectfully, it is the case here, Your Honor. At least it was a disputed question of fact as to whether that's the case here. Because what Mr. Ripps was doing, he is unquestionably a famous artist in the Internet space. He's been profiled in this space. And he was very clear that what he was doing was laying out a criticism of Yuga Labs and of NFTs. That is different than what Yuga Labs was doing, which was selling NFTs, period. This was done as part of this broader artistic project. Or at minimum, at minimum, that was a disputed question of fact that should have gone to the jury on nominative fair use. If I could turn briefly to the issue of ownership, that's another way to resolve this case fairly squarely. Yuga doesn't dispute that they have no registered trademark. They're asserting only common law trademark rights. And they have no such common law trademark rights because of the statements in their own terms and conditions. Their terms and conditions say, quote, when you purchase an NFT, you own the underlying board A, the art, completely. They have public statements interpreting that that say things like, quote, we have no, sorry, all IP rights are granted to the member. We have none of those rights. And it was undisputed that those statements were made. It was undisputed that that is how the statement, the contract had been interpreted in public statements beforehand. And that was, in fact, Yuga's point of differentiation, that they were giving these broad, worldwide, commercial, unlimited licenses to allow entities to, quote, produce and sell merchandise. That is an abandonment, effectively, of trademark rights. But don't they reserve certain rights? Because, for example, on the secondary market, if these products were resold and they were entitled to a royalty, correct? They were not. And they did not obtain any royalty when the products were resold. It is possible to structure an NFT that way. That is not the way that Yuga structured their NFT. It is possible to do that. And some entities have. This license was not one that did that. They claimed no such rights. And that is. So the only profit that they made was on the front end. Correct. And not on the secondary market. That's exactly correct, Your Honor. Now, they could have. Did RR Basie end up having, maintaining some secondary rights? No. No profits back to the original contract creator on the secondary, as a result of the secondary market sales. So you can set up an NFT that way. These NFTs were not set up that way. And so what Yuga did was gave this away. And we had, gave away all of the trademark rights. And where entities then use the trademark rights, that is an abandonment of trademark rights that precludes your common law trademark from continuing to function. Might have been different if they'd had a registration. They did not have any such registration. And there were dozens and dozens of products, including other NFT collections, to Your Honor's point about these being somewhat more similar than, say, a service. There were other NFT collections also using Bored Ape Yacht Club that Yuga did not dispute were sold, in many instances did not dispute were licensed. They're all in the record, 2ER, 331, 323, 333 to 412. Dozens and dozens of these other products using the mark. That is absolutely an abandonment of trademark rights and a failure to police. And given that naked license, they can no longer enforce their common law rights. So I guess on that question, you split out the NFT from the underlying art. So isn't your argument more about an abandonment of the underlying art, not so much abandonment of the NFT? No, Your Honor, because the contract itself, Yuga's terms and conditions made clear that it is a purchase of the NFT. So the NFT itself is what is purchased. So all of the rights to the NFT, as well as the rights to the underlying art, go to these purchasers. And respectfully, as we pointed out in our brief, the underlying art does include the trademarks, right? It includes, for example, the ape skull logo in the underlying art. So if an entity has the right to use that unfettered, that is exactly the kind of license here. At minimum, again, there was a disputed issue of fact on this. That is certainly sufficient to allow the finder of fact to determine whether or not there is an issue. And then the last thing I would say is – Well, let me ask you. With respect to abandonment, given that Yuga would have actively promoted the brand, hosted these large-scale events, offline social communities, celebrity endorsers, wouldn't that be evidence of the continuation and maintaining of these marks? I think it may be evidence of the continuation of their marketing activity. Marketing of what? Of Yuga Labs as a company and of this sort of club. But that is different than a continuation of the use of the mark so that it continues to function as a trademark, to provide the source-identifying role that a trademark is supposed to provide. That is what they did not do. And I would point out again that even if this court were to find – and I don't want to spend too much time on this. I know I'm in my rebuttal. Even if this court were to find that these issues were disputed issues of fact, right? Even if it is close, right? At minimum, this should not have been dealt with on summary judgment. And it should not have been allowed to then go toward a jury trial and then have the jury trial removed by this abandonment of legal remedies at the last minute. As this court has said in the Sonner case, that is an inappropriate way to use equitable remedies in place of legal. And that has been essentially the story of this case. I will reserve the rest of my time for rebuttal if I may. Before you sit down, I have one other question. Of course. Perhaps our presiding judge will be a little bit more lenient with time. On the copyright counterclaims that your client has brought, what is your best evidence to show that the providers that took down content were relying on statements that were made in the notices that you challenged that relate to copyright as opposed to trademark? I think the best evidence is as to the foundation website copyright takedown, which appears at 3 ER 628 to 629. There's no dispute that was taken down following that notice. And the foundation takedown, the subject line is, quote, Yuga Labs, Inc., notice under DMCA, foundation app. The first sentence of the email is, we are contacting you as the DMCA agent. So when you refer to DMCA in the subject line, refer to it in the first line. And then mention copyright also again, saying that they represent the copyright. The district court noted that there's things in the record to indicate that what was really being said in those notices was an assertion of trademark rights and that even the response that providers were giving back seemed to understand that. I think at minimum that's a disputed issue of fact. I don't dispute that there are references also to trademark there, but the DMCA is supposed to be this extremely fast mechanism to allow copyright and copyright only violations to be remedied, not trademark. And so what they did was they got the attention of these entities by filing a DMCA notice, but in fact had no DMCA rights. That is exactly what 512F is supposed to prevent. Well, that may be, but if the service providers didn't materially rely on what was any assertion of copyright rights in these notices, then it doesn't really matter. Well, that's a disputed question of fact as to whether they materially relied or not. And so that's, again, an error there. But the district court didn't rule on that basis. The district court said these are not DMCA notices, so 512F is not triggered. That was the error because at minimum it was disputed as to whether they were 512F, and we would say it was also disputed as to whether the reliance was there warranting the sanction of 512F. So I want to ask you about something entirely different. You have focused on nominative fair use and really haven't touched at all on the sleek craft factors. So it seems that the market issue, the 48 Yacht Club, is a very strong mark. It's fanciful. It's not descriptive. And then you have argued that relying on the enterprise media case, that if by attaching RR and a forward slash to a very strong mark, that means that there's not a likelihood of confusion or they're dissimilar on that basis. But it seems to me that something very important about that case is that the enterprise mark was quite weak. It was descriptive. And here the mark is quite strong, and enterprise states that if the mark is strong, then the similarity is stronger and the likelihood of confusion. So if we thought, okay, you added a couple letters and a slash, that means they're not similar. Couldn't you do that to any mark? I mean, any strong mark could then just become dissimilar because you add a couple letters and a slash? A few responses, Your Honor. It is definitely a fact-dependent issue and depends on a broader set of totality of circumstances as to whether a modification is or is not sufficient. And we agree, it depends in part on the strength and distinctiveness of the mark. We don't dispute that at all. I would say this, however. Number one, it's incredibly unusual to resolve sleek craft at summary judgment because of the fact-intensive nature of these things. This is one of the only cases in which a plaintiff has ever been granted summary judgment on sleek craft ever, as far as we know. But I would say the second thing I would say about specifically adding the RR, I think if you look into that entrepreneur or media case, it is true that the fact that entrepreneur was a fairly generic mark gave it weakness under sleek craft. But I don't think, if you look at the actual analysis of the addition of the letters, that the weakness materially affected the importance of the addition of the letters. What they discuss in that case is something like the D.C. and Washington, D.C., distinguishing it from the state, and that is true. And it's especially true in the Internet context. That is, if you have a website that says toyota.com, that is very different than toyotastinks.com, and nobody would be confused notwithstanding that. But what if it were something like RR forward slash Nike? You know, Your Honor, I think that may very well be sufficient, again, depending on the facts, if, as we have here, you have someone who is a prominent critic of the brand, who's known very publicly for having made public statements in this space, who's an artist in this space. If Mr. Ripps, now Mr. Ripps has, in fact, done work for Nike, so I don't think he would do this, but if he were to establish a reputation as a prominent critic, then it may very well be that just adding RR to Nike is sufficient. The issue is it's a fact-dependent question, and entrepreneur makes very clear. So are you suggesting that a district court could never grant summary judgment on the sleek? Of course not, Your Honor. I mean, there's undisputed facts, and they make a determination as a matter of law. I agree. If the facts are indeed undisputed and it's a determination as a matter of law, of course the district court could make a determination of summary judgment. The issue is it's rare, and it's rare, and it should not have occurred here because the facts really have to be genuinely undisputed. And here, where we have a circumstance where we have a critic trying to exercise rights to critique what he perceived as the impropriety of Yuga's business model and the hateful imagery in their product, where in that circumstance it really should be exceptionally rare to determine this on summary judgment because the criticism and the parody and the rest of it plays so much into exactly the questions that Sleek Craft looks at. So I don't think it is impossible. I think it's rare, and it's rare for a reason, and the errors the district court made here are very stark on the typical buyer and on the misapplication of that entrepreneur case that Your Honor described. That is an indication of why this is not the kind of rare case that should grant summary judgment for a plaintiff in a trademark infringement case. All right. Well, we've taken you over time. I'll give you three minutes for rebuttal. Thank you, Your Honor. Mr. Gregorian. Good morning, Your Honors. May it please the Court, Todd Gregorian of Fenwick and West for Plaintiff Yuga Labs. I'll take the subjects in the order that Mr. Topper has presented them and then circle back to Sleek Craft and anything else the panel would like to hear from unless the panel has a different agenda. So I think the reason why the Court saw this as the unusual case in which you can straightforwardly grant summary judgment is that the core conduct that was challenged was akin to counterfeiting. It was creating identical products, marking them with identical, not modified marks, and then putting those out to market, sometimes under identical advertising of our marks, other times slight modifications, but ultimately in a market where these products trade and retrade with no association to Mr. Ribbs other than scrutinizing the smart contract. So when you come to the fair use analysis, this is a question of whether there is fair use for a counterfeit product. If someone makes a copy of a Nike shoe and slaps the Nike brand on it and sells it in Foot Locker and allows it to be sold on eBay, can you come back to the Court and say, well, no, my intention in doing that, irrespective of what the reasonable consumer sees when they see it in the marketplace, was to make some sort of sly comment about Nike and their labor practices? And those people who knew me and saw my website elsewhere on the Internet and these dozen or so hearsay emails that I received that acknowledged that they've seen my website and understand that meaning, does that somehow convert? Is that a record on which there is now a tribal issue about whether a reasonable consumer walking into Foot Locker sees a counterfeit Nike shoe designated Nike and associates it with an artistic project rather than just a sale of a product in the market as one usually expects? Well, it seems like you're arguing the likelihood of confusion analysis more than the fair use analysis. And on that point, here, because what you're buying is an NFT and not the art, your analogy falls apart a bit because the NFT is something different than the art. So I would contest the premise, Your Honor, and there is where the record is undisputed, that the product that Yuga Labs sells is an NFT with an associated image that conveys rights in that copy of the image and as well as a copyright license to use the ape that is depicted as well as other benefits. You can do all of that without an NFT being involved. And because there is an NFT involved, the analysis necessarily is more complicated, it seems to me. So I think, well, I won't say, I won't opine on whether it's more complicated, but what the analysis is, in the fair use realm, is did they use the mark to refer to the product that was sold? Going back to my threshold question with respect to Jack Daniels, does Jack Daniels affect the analysis at this point? Absolutely, Your Honor. Why? Because Jack Daniels is a First Amendment case and nominative fair use is a doctrine that's born out of the First Amendment. And Jack Daniels said there is no special protection under the First Amendment when you're using a mark as a trademark to designate the source of the good. Now, I think that principle is already baked in to the nominative fair use doctrine, so I don't think this panel has to reach beyond anything that Toyota says. So what is the standard that they had to meet? Well, the defendant is seeking to assert that doctrine needs to show that it used the mark to refer to the trademarked good. Namely, they need to show that their use of the mark referred to Yuga Labs' NFTs, not their NFTs. And while Mr. Topper said that was our burden, that's an incorrect statement. Toyota maintains that threshold burden on the defendant seeking to assert nominative fair use. And that's where things fall down because, yes, there is a technological back end to NFTs, but the question here is what did consumers on the undisputed record see? And the evidence was that Mr. Ripps used our marks in the smart contract. That had the effect of emblazoning the Nike shoe with Nike, marking the fake Rolex watch with Rolex because it causes those NFTs. When they appear for sale in the secondary markets and when authentication websites and bots that announce to the public what transactions have occurred, it causes all of those things just to read the metadata as Bord et Biot Club and B-A-Y-C. And so to return to my Nike analogy, the situation is actually worse than if you had fake Nikes sold as Bord et Biot Club in Foot Locker on the shelf next to real Nikes. If you had the town crier in front of the store and when a sale of the fake Nike is made, he says, everyone, I would like to announce to you that Nike Air Jordans just sold for $5 at Foot Locker. And someone else next to him, an accountant, says, I can verify. I can verify that an authentic Nike just sold at Foot Locker for $5. And so the idea that this is, well, to conclude on fair use, there is just no question of fact that those core uses were uses of Armark as a source to designate his product, and that's how consumers saw them. And that's why I don't think we need to get into, the court doesn't need to go beyond that, really. On Sleecraft, it doesn't seem like the district court did much analysis of the record, particularly as to the positions of the defense. And in so doing, and given how fact-intensive this area of law is, how can we affirm what the district court did as to its Sleecraft analysis? Absolutely, Your Honor. So I think there's a really clear path here, and it is, what did the district court consider at summary judgment? And that is whether the defendants were liable of some form of trademark infringement. And it answered that question, yes. And it answered that question based on the sale of counterfeit NFTs. It said the conduct that is challenged in this case is the sale of products that are made to look like legitimate board apes, and then marked with the board ape yacht club mark and sold. And the district court has already been affirmed in that regard by a different panel of this court on the state law claims, different legal context and anti-SLAPP. But nonetheless, that panel said what this lawsuit challenges is the sale of copied cat, board ape, yacht club NFTs. And so if you look at the district court's Sleecraft analysis, it is tailored to that conduct. So it talks about Mr. Ripps's design of an identical product, including copying over our ape IDs so that his would appear with the same numbering, his marking them with our unmodified marks. And in that, when he talks about use of the mark, the district judge says explicitly the use of the mark in the NFT. So he is referring to that use of the mark in the smart contract to designate the product. And then he talks about marketing channels and what marketing channels does he rely on. He relies principally on the secondary marketplaces, OpenSea and XTY2, where these things go out and appear essentially unaffiliated with Mr. Ripps, but for some very close analysis. And so on the – I'm sorry. One lingering question that I have based on the briefing and the argument that you're making now is your argument makes perfect sense if we're talking about a typical consumer market. I don't think the NFT market is your typical consumer market. And so I guess I come back to, isn't this more complicated than you're making it? Because we're not just talking about Nike shoes sitting at Foot Locker. We're talking about something that is, I mean, at least in my experience, trying to get up to speed in this case. Like, what are we even talking about? What is an NFT, right? So the people in this market have a different understanding and are coming at this from a different place. Isn't that fair? So it is fair to say that the body of reasonable consumers is different from the body of reasonable consumers. And would you agree that the SleepGraft test is all about trying to figure out the consumer in our relevant market, not a generic consumer that buys anything out in the world, but a consumer out there that buys this, an NFT? Yes, Your Honor. And so let me address how that was handled on this record, which was everyone had their opportunity at summary judgment to prove up the reasonable consumer, and there was no dispute of fact. The products appear identically on an online marketplace. It was undisputed that where consumers go to verify the authenticity of those products, the EtherScan website copied our exact marks. And so someone looking at EtherScan would, someone who was sophisticated enough to look at EtherScan to verify the provenance of their NFTs, would see EtherScan representing these to be legitimate board API club as opposed to a counterfeit. But as to the reasonable consumer, the district court made two rulings, right? One is just that some sophistication is required in this market to verify provenance, and he did that based on the express admissions of defendants. And the second ruling he made is that defendants knew some consumers in this market were likely to be deceived, and there is ample undisputed evidence in the record for that ruling because it is shot through defendants' communications about their project. The people in this market who have been drawn into it by the Tonight Show, Rolling Stone, all the publicity that NFTs were receiving at the time, those are sheeple. Those are sheeple who will not read the smart contract. Oh, they are likely to be confused by our use of the mark on this ape market website that we're designing. These are all internal communications the defendants made among themselves while they were not subject to the scrutiny of the court. And so how does that apply in the larger sleep crack analysis? Well, this court has said the reasonable consumer is not one person. The reasonable consumer is a range of folks. And the reasonable consumer standard is concerned with the least reasonable of those folks. The least sophisticated person who we would also deem a reasonable consumer should not be deceived. And here it was clear that such a person would be deceived, and that is because, as this court has held, when someone marks an identical product with an identical mark, confusion follows this course, of course. It is also true because the evidence of such likelihood of confusion in the record was undisputed. There were two surveys, one of how the marks appeared on OpenSea that included the modified mark RRBAYC, and there was a likelihood of confusion there. And so the idea that we can argue now, Your Honor, that based on conjecture that RR might be a differentiator, the record is set. The record was that was confusing. When those two marks were together on OpenSea, it confused people. The other survey was about the foundation website and the whole process, the buying process of the NFT. The survey used the foundation website of the defendants after he had begun modifying logos and changing them to make sarcastic comments and points of distinction, and that found a 40 percent likelihood of confusion. And so while— Let me ask you, given that on a motion for summary judgment, the reviewing court is required to consider the evidence in the light most favorable to the non-moving party, and so then here that would be Ripa Ryder, and you have evidence in the record regarding how on the issue of intent there were disclaimers, there were these artist statements, there were these links to critical pieces, and those aren't even referenced at all. To the extent that they're not referenced at all, how can one reliably conclude that the court considered all of the evidence and considered it in the light most favorable to the non-moving party? Right. So the issue with that is that there is no connection, no necessary connection between the separate website he set up with a disclaimer and reasonable consumers seeing these— But shouldn't the district court have said that then? It's as if the evidence didn't exist. Perhaps, Your Honor, but I guess the question for this court is, viewing the evidence in the light most favorable to the defendants, is there liability for trademark infringement? And the district court's ruling that by marking the same product with the same mark and allowing it out into the marketplace in the wild where it would not be associated with this disclaimer, he was committing infringement. And so the question of the disclaimer becomes an issue for the remedies trial, which we had. For the remedies trial or for the trier of fact in trying to sort all of this out? Even as far as the marketing channels, there was no reference by the district court as to this. Are basee.com being utilized to sell these NFTs? Again, as if it doesn't exist. And so if you're considering marketing channels to fairly evaluate the record, then that has to be something that's at least noted, if not distinguished or weighed or considered. Well, so I don't think you mash all the marketing channels together, right, and just say, you know, is it the same or different? Those give rise to separate types of claims, and most clearly that is evident in this court's decision in Lindybend, which said, look, these things, when they're sold in the store, the branding is completely different. But when they're sold in the telephone market, which is a market where they overlap, they just show up at the office bearing the mark auditor, a variation of the mark auditor. And so the court spliced those two things and affirmed non-infringement on the former and remanded on the latter, and there were follow-on decisions ultimately a determination of liability. So the question is, what relevance does the separate disclaimer website have in this record for the facts on which the court found liability? And the answer is there is none. There is no connection. There is no evidence about how reasonable consumers. But do you agree that these are relevant considerations under Sleecraft, these pieces of evidence I'm referring to, these disclaimers, these artist statements, these sales over rrbasey.com, are they relevant? I agree that they, if this were solely a case about sales about, sure, I can concede that. Of course they're relevant. And given how incredibly fact-intensive the Sleecraft test is, ultimately that's why this court, the Ninth Circuit, has instructed district courts to be wary, not to grant summary judgment willy-nilly without taking into account the complexities and all the various pieces of evidence. I'm happy to concede that, Your Honor. But this court also has the rulings in Lindypen and Stonecreek when there was an actual trial, and the court directs entry of judgment of infringement, finding that even though many of the fact-intensive factors favored the defense, the fact that the defendant marked the same product with the same mark and allowed it out in the same marketing channels just gives rise to confusion as a matter of course. This is the simple case. Matter of law? Did the court basically uphold the lower court's or the jury's determination versus finding that as a matter of law? So in Lindypen and Stonecreek, the circuit reversed the district court's determination of no infringement because the likelihood of confusion from those three core factors was so strong. So as to override all countervailing factors. The reason why this case is the rare case, and Your Honors, do not see many of these, is because counterfeiters usually fold when they are sued or the case is resolved in its early stages. This is the rare case where the defendants hid behind a claim to be performing art that was contrary to the record and that was ultimately found to be false. With that, we'd ask the court to affirm any further questions. I have a question about the cybersquatting claim. My understanding from the record is that your client has abandoned the ape mark. Is that correct? That's correct. The cybersquatting determination is based on the board ape mark. Okay. So then the apemarket.com domain, how does a claim related to that survive? It incorporates prominently a portion of a famous mark. And what is that? Board ape. The word ape in ape market is the connection to board ape. Your Honor, that is the source of confusion at the first step and, of course, at the second. What's your best authority to say that that's close enough? So the My Coke and Drink Pepsi cases, there are slew of cases where minor modifications to the mark and the domain name are sufficient. And the reason that is okay for cybersquatting where it might not be okay under the higher likelihood of confusion standard is because the preemption concern is addressed at the back end of the analysis. I guess it's falling apart for me a little bit because what if somebody out there said, I'm going to register a domain for ape rescue? And that's exactly where I'm going. Someone who registers that domain and uses it for such does not have bad faith intent to profit from the use of our mark. And so it's that second part of the analysis that shores up the lower likelihood of confusion standard to ensure that preemption doesn't happen and that people are free to use parts of marks in legitimate ways. Thank you. Thank you, Your Honors. All right. Thank you. Mr. Tomprose. Thank you, Your Honors. We heard counterfeit many, many times. That was a disputed question of fact. Whether this was criticism or counterfeit was a key disputed question of fact. Facts have to be interpreted in the light most favorable to the non-moving party. And they were not counterfeits. It certainly was interpreted that way. On the sleek craft question, I heard counsel say that we should apply the least reasonable consumer test. That's not the test. That is sort of where Brookfield was going. But network automation made very clear that where there's expertise in the field, you have to apply the expertise that's in the field. These are NFT purchasers. And there was sufficient evidence in the record that, quote, typical NFT purchasers are familiar with blockchain technology and the tools needed to determine provenance. That's ADR 1523. Separate testimony saying the same thing at 3ER 597 and 98. The typical consumer, people just don't go out and buy NFTs. Typical consumer knows how to figure out and look at the actual creator to figure out what they're buying. On the remaining issue on the sleek craft factors, I heard counsel say there was no need to consider the rrbayc.com website and the disclaimer and the artist statement there because it was a separate disclaimer website. Just not true. The factual record makes clear that is where the sales happened, were through the rrbayc.com website. The district court did not address that. It did not address it at all. And then I think there is, as Judge Forrest was getting at, a distinction here between NFTs and other types of goods. The point, one of the two key points that Mr. Ripps was trying to make with his art, as he said, at rrbayc.com was, quote, clearly defining what we are buying when we purchase an NFT is one of the primary goals of this work. And it is confusing to people what they are, to the general public, not to purchasers, but to the general public, what they're buying when they buy an NFT. You can buy an NFT to the Mona Lisa. You can buy an NFT to Mahler's First Symphony. Because you can buy those things, you do not have the rights to the underlying work here. That is why this is different. And what Mr. Ripps was doing was pointing out that having an NFT that links to a monkey picture does not give you rights to the monkey picture. That was a key piece of what he was doing and why it is very different from these kinds of counterfeiting type cases that the council has identified. And then one final thing on the issue of nominative fair use in the relationship to Jack Daniels. Even if Jack Daniels is affected in some way, it does affect that analysis in some way, it only matters if there's source identification here. And in the source identification cases like Jack Daniels, like the Punchbowl case, you have indications that the entity that was doing this was trying to sell this as the source. So in Punchbowl, there was a registration of the trademark. And the same thing essentially in Jack Daniels with the mark on the back. Mr. Ripps never tried to register any trademarks. This was criticism, not competition, not counterfeiting. It was criticism and an artistic project to attack the Bordet Biat Club, not the opposite. Thank you. Thank you. Council, thank you for your arguments. They were very helpful. And this case is submitted and we are adjourned for the day. All rise. Thank you. This court for this session stands adjourned.
judges: BADE, FORREST, Curiel